1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11 | IN RE DURA PHARMACEUTICALS, INC. SECURITIES LITIGATION

CASE NO. 99CV0151 JLS (WMc)

12 | 

**ORDER GRANTING IN PART WITHOUT PREJUDICE AND DENYING IN PART MOTION TO DISMISS FOURTH CONSOLIDATED AMENDED COMPLAINT**

13 | _____

14 |

15 | This Document Relates To: All Actions

16 |

(Doc. No. 138)

17      This is a putative class action for securities fraud.  Presently before the Court is the motion

18 to dismiss the Fourth Consolidated Amended Complaint ("FCAC") by defendants Dura

19 Pharmaceuticals, Inc. ("Dura"); Cam L. Garner; James W. Newman; Charles W. Prettyman; and

20 Walter F. Spath (collectively, "defendants").[1]  (Doc. No. 138.)  Defendants' motion focuses on the

21 allegations pertaining to Dura's Albuterol Spiros inhaler, which failed to obtain FDA approval,

22 and on all allegations concerning Prettyman, Dura's Senior Vice President of Development and

23 Regulatory Affairs.  For the reasons stated herein, with respect to the Albuterol Spiros inhaler, the

24 Court grants in part and denies in part.  With respect to the allegations concerning Prettyman, the

25

26      [1] Also before the Court is defendants' request for judicial notice.  (Doc. No. 141.)  Defendants'
request is unopposed.  Insofar as the Court has relied on the documents in defendants' request, that
27 request is **GRANTED**.  With respect to SEC filings, the Court takes judicial notice only of the
statements contained therein, but not for the purpose of determining the truth of those statements.  (See
28 Doc. No. 135, at 26 n.3 (citing Troy Group, Inc. v. Tilson, 364 F. Supp. 2d 1149, 1152 (C.D. Cal.
2005).)

1    Court grants the motion to dismiss.

2    **BACKGROUND**

3    **A.      Factual Background**

4           The Court incorporates by reference the thorough description of the background facts of

5    this case contained in the Hon. M. James Lorenz's Order granting in part and denying in part the

6    motion to dismiss the third consolidated amended complaint ("TAC").[2]  (Doc. No. 135, at

7    2:1–7:20.)   To the extent that the FCAC contains the same factual allegations, the Court does not

8    repeat them here.  Where the FCAC provides greater specificity concerning those allegations, the

9    Court addresses those new allegations in its substantive analysis infra.

10          Generally speaking, this case is a putative class action brought by purchasers of Dura

11   securities between April 15, 1997 and February 24, 1998 ("class period"). (FCAC ¶ 1.)  Plaintiffs

12   allege violations of federal securities laws arising from the development of the Albuterol Spiros

13   inhaler, "a method of aerosolizing powders so that asthma medicines . . . could be inhaled."  (Id. ¶

14   3.)  Plaintiffs allege that, despite the discovery of problems during the product development

15   process that effectively guaranteed rejection by the Food and Drug Administration ("FDA"),

16   defendants nonetheless pushed forward with a new drug application ("NDA") and represented to

17   the public that the inhaler would reach the market as a matter of course after obtaining FDA

18   approval.

19          Plaintiffs further allege violations of federal securities laws arising from misrepresentations

20   and omissions regarding Dura's sales of its primary drug, Ceclor CD.  (FCAC ¶ 29.)  Plaintiffs

21   specifically allege "a scheme to artificially inflate [Dura's] revenues and earnings" by unloading

22   excessive amounts of Ceclor CD onto wholesalers with unusually favorable terms so as to

23   maximize Dura's revenues and earnings per share.  (Id. ¶ 34.)  While Dura represented that sales

24   of Ceclor CD were strong and on the rise, those sales actually declined throughout the class period.

25

26

27          [2] Judge Lorenz's Order granting in part and denying in part the TAC is also a published
     opinion.  See In re Dura Pharms., Inc. Sec. Litig., 452 F. Supp. 2d 1005 (S.D. Cal. 2006).  The Court
28   cites interchangeably to the Federal Supplement and the Order docketed in this case, i.e., Doc. No.
     135.

**B.      Procedural Background**

With respect to events in this litigation preceding the Order on the TAC, including the decision of the United States Supreme Court on the issue of loss causation, this Court incorporates by reference the thorough description of Judge Lorenz's Order concerning the procedural history of this case.  (Doc. No. 135, at 5:22–7:20.)  On June 2, 2006, Judge Lorenz dismissed plaintiffs' claim with respect to the Albuterol Spiros inhaler.  Although the TAC adequately alleged loss causation, Judge Lorenz dismissed for the failure to plead with sufficient particularity the source of plaintiffs' allegations with respect to falsity and scienter.  (Doc. No. 135, at 21:27–22:3.)  Plaintiffs were not sufficiently specific in their descriptions of various Dura internal reports detailing problems in the inhaler's development.  (Id. at 20:15–21:15.)  Also, plaintiffs did not describe any confidential witnesses to support allegations regarding Dura executives' knowledge of those problems or fraudulent intent to conceal those problems.  (Id. at 21:16-17.)  "The absence of such allegations [was] significant because the crux of Defendants' malfeasance comes from their decision to forge ahead with clinical trials and the NDA submission notwithstanding their inability to remedy the problems identified" in the early stages of product development.  (Id. at 21:23-26.)

Judge Lorenz further held that plaintiffs adequately stated a claim against Dura, Newman, Garner, and Spath concerning these defendants' representations and omissions in the scheme to overload wholesalers with Ceclor CD.  (Doc. No. 135, at 29:8-10.)  With respect to the remaining defendants,[3] Judge Lorenz found that the TAC did not successfully impute liability based on group pleading, stock sales, their corporate positions, or motive.  (Id. at 29:10-13.)  Judge Lorenz limited the scope of the claim to exclude statements in securities analysts' reports.  (Id. at 35:25-27, 37:3-6.)  Judge Lorenz found that the TAC failed to allege the specific statements that defendants made to the analysts.  (Id. at 35:25-26.)

Judge Lorenz granted plaintiffs leave to file an amended complaint.  (Doc. No. 135, at 37:2-6.)  On July 21, 2006, plaintiffs filed the FCAC.  (Doc. No. 137.)  On September 5, 2006, defendants moved to dismiss the FCAC.  (Doc. No. 138.)  Plaintiffs filed their opposition on

---

[3] Prettyman is the only one of these defendants who reappears in the FCAC.

October 19, 2006.  (Doc. No. 144.)  Defendants replied on November 13, 2006.  (Doc. No. 146.)
The motion was then deemed submitted as of December 4, 2006.  (Doc. No. 149.)

This case was reassigned to the Hon. Janis L. Sammartino on October 3, 2007.  On
November 14, 2007, after the Court set the matter for oral argument, but before oral argument took
place, plaintiffs submitted a supplemental brief concerning the Supreme Court's decision in
Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499 (2007). (Doc. No. 154.)  Defendants
submitted their own supplemental brief on November 29, 2007.  (Doc. No. 156.)

The Court held oral argument on the motion on December 14, 2007.  After the matter was
taken under submission, plaintiffs submitted a second supplemental brief on February 1, 2008
concerning the Seventh Circuit's decision in Makor Issues & Rights, Ltd. v. Tellabs, Inc., 2008
WL 151180 (7th Cir. Jan. 17, 2008).  (Doc. No. 158.)  Defendants filed a second responsive
supplemental brief on February 12, 2008.  (Doc. No. 159.)

**LEGAL STANDARD**

The Court incorporates by reference Judge Lorenz's thorough description of the applicable
law pertinent to motions to dismiss in securities class actions.  (See Doc. No. 135, at 7:21–10:7.)
That description explained, inter alia, the requirement to plead falsity and scienter with
particularity under the Private Securities Litigation Reform Act (PSLRA).

Since Judge Lorenz's Order on the TAC, the Supreme Court clarified that, in determining
whether the pleaded facts give rise to a "strong" inference of scienter, the court "must take into
account plausible opposing inferences."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., — U.S. — ,
127 S.Ct. 2499, 2509 (2007).  The Court explained that the strength of an inference depends on its
particular context: "To determine whether the plaintiff has alleged facts that give rise to the
requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations
for the defendant's conduct, as well as inferences favoring the plaintiff."  Id. at 2510.  A complaint
survives a motion to dismiss under the PSLRA "only if a reasonable person would deem the
inference of scienter cogent and at least as compelling as any opposing inference one could draw
from the facts alleged."  Id.

//

**DISCUSSION**

**A.     Sources of the FCAC's Allegations**

When plaintiffs base their allegations on information and belief, "[i]t is not sufficient . . . to set forth a belief that certain unspecified sources will reveal . . . facts that will validate [plaintiffs'] claim."  In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999); In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1023 (S.D. Cal. 2005).  Although a complaint may keep confidential the identities of personal sources, those confidential witnesses "should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004); Alaska Elec. Pension Fund v. Adecco S.A., 371 F. Supp. 2d 1203, 1211 (S.D. Cal. 2005).  A complaint relying on anonymous confidential witnesses must also contain "adequate corroborating details." Nursing Home, 380 F.3d at 1233; Adecco, 371 F. Supp. 2d at 1211.  To determine the adequacy of allegations based on confidential witness accounts, the court evaluates "'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of the sources, [and] the reliability of the sources.'" In re Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting In re Cabletron Sys., Inc., 311 F.3d 11, 29 (1st Cir. 2002)); Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1141-42 (W.D. Wash. 2006).

Where plaintiffs rely on internal reports, plaintiffs must provide such details as the sources of the plaintiffs' information about the reports, the way plaintiffs learned about them, the authors, the officers receiving the reports, and an "adequate description" of the contents.  Silicon Graphics, 183 F.3d at 985; Adecco, 434 F. Supp. 2d at 831.  Here, plaintiffs rely on internal reports as the corroboration of the confidential witnesses.  Judge Lorenz's prior Order found that plaintiffs provided sufficient details to establish the reliability of the Eisele List, a summary of problems with the inhaler originally prepared in October 1996 by Dura's Vice President of Product Development.  (Doc. No. 135, at 20:7-14.)  Otherwise, however, Judge Lorenz found that plaintiffs insufficiently alleged the existence of other internal reports, e.g., analyses of chemical stability test

1    results, minutes of product development meetings, configuration modification reports, and product

2    reliability reports.  (Id. at 20:15—21:15.)  Because of plaintiffs' reliance on the corroborating

3    details in the internal reports, the Court begins with its analysis of the internal reports and then

4    evaluates the reliability of the confidential witnesses.

5           1.      Internal Reports

6          Although Judge Lorenz found sufficient indicia of reliability concerning the Eisele List,

7    Judge Lorenz found the TAC's allegations inadequate with respect to three other types of

8    documents: (1) chemical stability test results and analytic reports allegedly circulated during

9    product development meetings; (2) modification reports drafted by Senior Project Engineer Mike

10   Ligotke and Project Leader Linda Gieschen; and (3) product development reports, also prepared

11   by Ligotke and Gieschen.

12         With respect to the stability tests and analytic reports, the FCAC remains vague, even after

13   amendment, concerning the authors of those reports.  (FCAC ¶ 11.)  While citing confidential

14   witnesses as plaintiffs' sources concerning those reports, the FCAC still does not explain, in turn,

15   how the confidential witnesses themselves learned of those reports.  The ongoing deficiencies in

16   plaintiffs' pleading of these reports are mitigated, however, by the confidential witness accounts of

17   the product development problems.  Confidential witnesses identify the specific problems that

18   were allegedly discovered during the stability tests and the ways that the product development

19   team communicated those problems to the defendants.

20         Plaintiffs have provided further details concerning Ligotke and Gieschen's modification

21   reports.  Plaintiffs cite confidential witnesses as their source for learning about the reports.  (FCAC

22   ¶¶ 95, 122.)  Plaintiffs now explain who received these reports (namely, Prettyman and the

23   Regulatory Affairs Department), although the FCAC remains vague concerning the frequency of

24   the "periodic basis" when these reports were prepared and distributed.  (Id.)  The FCAC pleads the

25   content of those reports with greater specificity, explaining how the modification reports

26   distinguished among the various inhaler configurations and the tests that Dura ran on each.  (Id.)

27         The allegations concerning the product development reports are responsive to some of the

28   defects identified by Judge Lorenz, but still remain problematic.  The FCAC now explains that the

reports were generated and distributed between mid-1996 and October 1997, during the class

period and contemporaneous with the Eisele list. (FCAC ¶ 17.) Nonetheless, the FCAC remains

vague as to the contents of these reports, and how they differ from the modification reports.

2.      Confidential Witnesses

The FCAC alleges the existence of 28 confidential witnesses[4] who support the FCAC's

allegations of falsity and scienter. (FCAC ¶ 65.) The number of legitimately pled CWs is smaller,

however. As defendants point out, the FCAC only describes ten CWs in detail, and attributes

factual allegations only to seven. (Memo. ISO Motion, at 4 n.6.) The Court focuses its analysis

on the three CWs whose allegations are most central[5] to the FCAC: CW3, CW6, and CW10.

The FCAC describes CW3 as follows:

> CW3 is a former Dura Senior Project Engineer/Staff Engineer on Albuterol Sprios
> (sic) drug delivery system. CW3 worked for Dura's Product Development
> Department from 8/96 until 5/00. CW3 was a Senior Project Engineer and was
> involved in "all aspects of the engineering and manufacturing scale-up activities"
> on the Spiros drug delivery system until 8/98. At that point, CW3 was promoted to
> Staff Engineer. CW3 was involved with preparing the company's NDA for the
> Spiros drug delivery system and helped draft the Chemical Manufacturing Controls
> ("CMC") sections of the application, which described how the device was made
> and the materials used to make it.

(FCAC ¶ 65(c).) CW3 is the source of the FCAC's allegations concerning electro-mechanical

problems in the inhaler's configuration, resulting in a greater than 30% failure rate during clinical

trials. (FCAC ¶¶ 119 & 121.) The FCAC also cites CW3 for the allegation that the individual

defendants learned of the inhaler's problems during executive management meetings held every

Monday morning. (Id. ¶ 121.) In one such meeting in October 1996, CW3 alleges that senior

management obtained the Eisele list. (Id. ¶ 123.) Plaintiffs cite CW3 for the proposition that

Dura's engineering staff opposed conducting Phase III clinical trials or filing an NDA until the

---

[4] The Court abbreviates the reference to a confidential witness as "CW#". For example, Confidential Witness No. 6 is identified as "CW6".

[5] Plaintiffs do not dispute that the FCAC fails to attribute any factual allegations to CW1, CW4, and CW5. The FCAC cites CW2 and CW9 once, as corroboration of the problems with mechanical failures described more thoroughly by other CWs and documented in internal reports (including the Eisele list). (FCAC ¶ 10.) CW7's only contribution is the corroboration of CW3's account of internal dissension within Dura as to whether to proceed with Phase III clinical trials and the NDA. (Id. ¶ 9.) CW8's account entirely overlaps with (and is less thorough than) CW10's account.

problems with the inhaler's configuration had been fixed.  (Id. ¶ 9.)  According to CW3, Garner and Prettyman also attended inhaler product development team meetings to discuss the results of clinical trials and stability tests.  (Id. ¶ 121.)  At one particular meeting, Garner specifically asked about the inhaler's reliability: the inhaler development team responded that over 30% of the inhalers failed in clinical trials.  (Id. ¶ 124.)  Finally, CW3 claims that, prior to filing the NDA, Garner and Prettyman met with FDA officials in Washington, DC to discuss the FDA's concerns about the reliability of the inhaler and the stability of Albuterol.  (Id.)

The Court finds CW3 to be a reliable source with respect to the electro-mechanical problems in the inhaler's configuration and the meetings with Garner, Prettyman, and the product development team.  The FCAC describes with particularity CW3's extensive involvement in the inhaler development process before, during, and after the class period.  Therefore, CW3 would be aware of any problems with the inhaler; furthermore, the identification of the same problems in the Eisele list (previously found by Judge Lorenz to be supported by reliable allegations) corroborates CW3's account of those problems.  As an engineer on the inhaler development team, CW3 would know about the fact and substance of the team's meetings with senior management.  CW3's memory of the substance of those meetings, included specific questions posed by Garner, supports a finding of reliability.

CW3 is not a reliable source, however, for allegations of meetings among Dura senior management officials and with FDA officials.  The FCAC does not explain how CW3 would know when senior management meetings took place or what documents were distributed in those meetings, much less what executives actually discussed in those meetings.  Even less plausible is CW3's knowledge of the fact, much less the substance, of a meeting in Washington, DC between FDA officials and executives of San Diego-based Dura.

The FCAC describes CW6 as follows: "CW6 is the former Vice President of Engineering Development.  CW6 joined Dura in 1998 and was responsible for the ongoing development of the Spiros inhaler device for which Dura had filed a NDA with the FDA in 11/97."  (FCAC ¶ 65(f).)  The Court declines to detail here all the factual allegations for which the FCAC cites CW6 as the source. Instead, the Court simply notes that all those allegations took place before CW6 began

working for Dura in 1998.  The FCAC provides no explanation for why CW6 would have

knowledge of events that transpired before his employment with Dura.  While plaintiffs "number

each witness and describe his or her job description and responsibilities," <u>Daou Systems</u>, 411 F.3d

at 1016, these details do not allow the Court to overlook the unlikelihood that someone in CW6's

position would possess the information alleged, <u>Nursing Home</u>, 380 F.3d at 1233. Therefore, the

FCAC's allegations citing CW6 as their source are almost entirely inadequate, except for those

allegations which are corroborated by other sources.[6]  (<u>See</u>, <u>e.g.</u>, FCAC ¶ 9 (citing CW3 <u>and</u> CW6

for confirmation of the Eisele list).)

    The FCAC describes CW10 as follows: "CW10 is a former Manager in the Regulatory

Affairs Department throughout the Class Period.  CW10 reported to Kathleen Heffernan, Director

of Regulatory Affairs, who in turn reported to defendant Prettyman.  CW10's responsibilities

included attending cross-functional meetings regarding product development as the main

representative of the Regulatory Affairs Department."  (FCAC ¶ 65(j).)  Citing CW10, the FCAC

alleges that defendant Prettyman "was involved" in the creation of Dura's press releases, and Dura

required all press releases to go through the Regulatory Affairs Department.  The FCAC further

relies on CW10 (with CW8 corroborating[7]) for the allegation that "the Individual Defendants were

each responsible for personally reviewing and/or 'signing off' on all SEC filings and press releases

issued by Dura during the Class Period[.]" (<u>Id.</u> ¶ 64; <u>cf.</u> ¶ 174.)  The Court finds that CW10,

having a position within the Regulatory Affairs Department and working for someone who directly

---

[6] At oral argument, the Court asked plaintiffs' counsel how CW6 could be a reliable source. Counsel informed the Court that CW6 "was hired in 1998 to do a comprehensive and thorough review of the history of the Albuterol Spiros efforts to date.  He reviewed all the documents in the file . . . and those documents had the defendants' names cc'd all over them."  (Transcript, at 8:4-11.)  Quite simply, none of this appears in the FCAC, and the Court has found no legal authority that would allow it to go beyond the four corners of the FCAC and credit CW6 as a reliable source on the basis of a job description that plaintiffs failed to plead.  In the nearly twenty-two months since plaintiffs filed the FCAC (and during the yearlong period when this motion remained under submission), plaintiffs never attempted to amend their description of CW6.  Therefore, as much as this additional information would heighten CW6's reliability as a source, the Court cannot consider it in deciding the present motion.

[7] CW8 worked in investor relations throughout the class period; CW8's duties included circulating press releases to upper management and then issuing them to the public. (FCAC ¶ 65(h).) The Court finds that CW8 is a reliable source concerning Dura's practices in preparing and issuing press releases.

1    reported to Prettyman, is a reliable source concerning the procedures of the department and

2    Prettyman's specific "involvement" in creating press releases.

3    **B.      Albuterol Spiros Inhaler**

4           1.      Factual Allegations

5           The Court incorporates by reference the thorough description of plaintiffs' allegations with

6    respect to the Albuteros Spiros inhaler, which appears in Judge Lorenz's Order on the TAC.  (Doc.

7    No. 135, at 10:14–14:13.)  Where the FCAC's allegations are different or described more

8    specifically, the Court discusses those new allegations in its analysis infra.

9           2.      Materially False Statements

10          Where a private securities plaintiff alleges that the defendant made an untrue statement of

11   material fact or omitted a material fact needed to make the statements actually made not

12   misleading, "the complaint shall specify each statement alleged to have been misleading, the

13   reason or reasons why the statement is misleading, and, if an allegation . . . is made on information

14   and belief, the complaint shall state with particularity all facts on which that belief is formed."  15

15   U.S.C. § 78u-4(b)(1); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002).  "[A]

16   statement that is literally true can be misleading and thus actionable under the securities laws."

17   Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) (citing In re GlenFed Sec.

18   Litig., 42 F.3d 1541, 1551 (9th Cir. 1994)).

19          In the context of statements regarding FDA approval, courts dismiss securities fraud claims

20   where a drug manufacturer predicts FDA approval several years in advance, despite complications

21   in the testing phase, because "the company could have known of problems in the testing

22   procedures, planned to remedy those deficiencies, and still thought it would achieve FDA approval

23   by the estimated date."  In re Syntex Corp. Sec. Litig., 95 F.3d 922, 930 (9th Cir. 1996); see In re

24   Connectics Corp. Sec. Litig., No. C 07-02940 SI, 2008 WL 269467, at *9 (N.D. Cal. Jan. 29,

25   2008) (dismissing claim with respect to statements that "may have been in the optimistic belief

26   that the [drug's] testing problem was a surmountable barrier to FDA approval").  By contrast,

27   during the FDA evaluation process, courts have allowed securities fraud claims to go forward

28   where the drug manufacturer allegedly made "misleading, optimistic public statements that [the

drug's] FDA-approval process was progressing positively[,]" even though clinical studies indicated that the drug "might not work and would never be approved by the FDA." Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996); see In re Amylin Pharms., Inc. Sec. Litig., No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003) (holding that a company cannot represent that its trial results met the FDA's requirements for approval where, in fact, "the FDA expresse[d] significant concerns regarding the sufficiency of the trials").

Many of defendants' statements alleged in the FCAC fail to satisfy the definition of material falsity because they are either factually true or merely predictive of FDA approval at a distant date, when Dura still had opportunity to remedy any deficiencies. To the extent that Dura reported the completion of clinical trials or indicated its intent to file an NDA in the second half of 1997, there simply is no false statement. (See, e.g., FCAC ¶¶ 73, 107.) The Court also does not find material falsity in the 1997 Annual Report, wherein Dura described the inhaler's intended design as "compact, durable, and reusable." (Id. ¶ 76.) The filing of the NDA was still more than six months away, giving Dura adequate time to remedy the deficiencies in its clinical testing so that the inhaler would conform to the intended design. Similarly, statements regarding Dura's expectation of FDA approval were not materially false while Dura continued to evaluate data from recently completed clinical trials. (Id. ¶ 75.)

Nonetheless, the Court finds that plaintiffs have adequately alleged material falsity, beginning with defendants' representations concerning the marketing of the inhaler less than four months before filing the NDA on November 10, 1997. (FCAC ¶ 145.) Specifically, on July 15, 1997, Dura held a conference call, in which Garner and Newman told securities analysts that "Dura was close to successfully . . . bringing the Spiros drug delivery system to market in 1998." (Id. ¶ 116.) Garner and Newman repeated these statements about ten days later in a "roadshow" with securities analysts and institutional investors, and made similar statements[8] in conference calls on October 14, 1997 and January 20, 1998. (Id. ¶¶ 126, 143, 157.) These statements were materially false when made because, as alleged by plaintiffs, Dura was not close to marketing the

---

[8] Specifically, Dura told investors that it "was on track" to bring the inhaler to the market by late 1998 or early 1999.

inhaler in 1998 because the clinical trials progressed in a way that doomed the inhaler's prospects of FDA approval.  Most importantly, plaintiff alleges the inhaler experienced a 30% early return rate (though industry standards dictated a return rate of less than 1%) and demonstrated electro-mechanical malfunctions during trials.[9]

Dura allegedly made further materially false statements after it submitted the NDA application.  Dura's advertisement in the April 1998 issue of a journal of respiratory medicine stated that the inhaler "is designed to deliver a relatively consistent dose of drug to the lungs, independent of the patient's ability to inhale forcefully."  (FCAC ¶ 162.)  In addition to the factors cited above, this alleged statement is materially false for the reasons stated in the FDA's subsequent letter of rebuke, i.e., that the advertisement "promotes an unapproved drug by making claims of safety and efficiency that have not been demonstrated by substantial evidence[.]" (Id. ¶ 163.)  The final materially false statement is the alleged November 3, 1998 press release, which stated that the FDA's letter of rejection did not raise issues concerning the clinical data in the NDA application.  (Id. ¶ 165.)  This alleged statement was materially false, inter alia, for the reasons stated in the NDA's notice of violation, i.e., the press release's failure to explain that the FDA was requiring Dura to submit totally new clinical data.  (Id. ¶ 166.)

Because several of defendants' materially false statements were allegedly made to securities analysts and then repeated in analyst reports, the Court confronts the question of whether the statements in the analyst reports are actionable.  In the prior Order on the TAC, Judge Lorenz dismissed plaintiffs' claims based on analyst reports because "[t]he TAC d[id] not contain any allegations specifying the statements Defendants made to analysts."  (Doc. No. 135, at 35:25-26.) The FCAC cures this deficiency by pleading the specific statements that defendants made to the analysts in the roadshow and conference calls.  Plaintiffs have moved beyond the TAC's

_____

[9] Even more compelling evidence of material falsity is that, by changing the inhaler's configuration during the Phase III clinical trials, Dura guaranteed the invalidation of those trials and, thus, the rejection of the NDA application.  The concept that Dura sabotaged its own NDA is the strongest evidence of the falsity of statements that the inhaler was "on track" for introduction to the market after timely FDA approval.  However, the only source cited for that proposition is CW6 (see FAC ¶ 119), who did not begin to work for Dura until 1998.  For reasons stated previously, based on the FCAC's description of CW6 (as opposed to counsel's additional representations at oral argument), the Court finds that CW6 is not a reliable witness for events taking place at Dura prior to the beginning of CW6's employment.

conclusory allegations that the analyst reports repeated information provided by defendants: the FCAC now states the precise statements that defendants allegedly communicated to the analysts.

"[W]hen statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be actionable[.]" Nursing Home, 380 F.3d at 1235.  By contrast, the statements are not actionable when analysts "repackaged defendants' actual oral statements in vague and impressionistic terms." In re LeapFrog Enters., Inc. Sec. Litig., — F. Supp. 2d — , 2008 WL 2900566, at *13 (N.D. Cal. Sept. 30, 2007) (citing Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1246-47 (N.D. Cal. 1998)). Applied to these facts, the Court finds that the FCAC adequately alleges that the statements in the analyst reports "clearly originated from" Dura, Garner, and Newman, and, furthermore, the analysts did not repackage those statements.[10]  The analyst reports quoted in the FCAC explain that Dura was "on track" to begin selling the inhaler in late 1998 and "confirmed" a launch date for the inhaler.  (FCAC ¶¶ 144, 158.)  These are the exact statements that Dura allegedly made to the analysts in the first instance, rather than the analysts' own projections, interpretations, or impressions.

Finally, the Court finds that plaintiffs have carried their burden "to set forth an explanation as to why the statement or omission complained of was false or misleading."  Cooper v. Pickett, 137 F.3d 616, 625 (9th Cir. 1997) (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)); Sec. & Exch. Com'n v. Levin, 232 F.R.D. 619, 622-23 (C.D. Cal. 2005). The FCAC provides extensive discussion of the fatal defects in the inhaler's design and trial performance, which explains the falsity of statements that Dura was "on task" to bring the inhaler to the market in late 1998 or early 1999.  CW3 observes that the inhaler suffered "significant electro-mechanical problems" during clinical trials, including problems with the circuit board and the battery-operated motor, and a 30% early return rate that well exceeded the industry standard.

---

[10] Because the Court denies the motion to dismiss the analyst report allegations based on defendants' direct liability for statements made to analysts in connection with a securities transaction, the Court does not address whether defendants placed their "imprimatur" on the reports by adopting analyst projections and forecasts.  In re Dura Pharms., Inc. Sec. Litig., 452 F. Supp. 2d 1005, 1035-36 (S.D. Cal. 2005) (citing In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1115 (D. Nev. 1998)).

(FCAC ¶¶ 119, 121.)  The Court finds that CW3 is a reliable source of the actual problems in the inhaler's performance during clinical trials because CW3 was thoroughly involved in the "engineering and manufacturing scale-up activities" and drafted sections of the NDA.  (Id. ¶ 65(c).)         Having found that plaintiffs adequately alleged materially false statements beginning in July 1997, the Court proceeds to consider whether plaintiffs have adequately alleged defendants' scienter concerning those statements.

         3.   Scienter

         A private securities plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); Silicon Graphics, 183 F.3d 970, 975 (9th Cir. 1999); In re Peerless Sys., Corp. Sec. Litig., 182 F. Supp. 2d 982, 987-88 (S.D. Cal. 2002).  "[T]he PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness."  Silicon Graphics, 183 F.3d at 979; In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007).  To satisfy this pleading requirement, "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the defendants knew or were deliberately reckless of the false or misleading nature of the statements when made."  Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001); In re Levi Strauss & Co. Sec. Litig., — F. Supp. 2d —, 2007 WL 2694245 (N.D. Cal. Sept. 11, 2007).  As explained supra, the Court must consider competing inferences which could be drawn in favor of plaintiffs or defendants and determine whether plaintiffs have pled a "strong inference" of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 127 S.Ct. at 2504-05; Belizan v. Hershon, 495 F.3d 686, 691 (D.C. Cir. 2007).

         Admittedly, the proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Middlesex Ret. Sys. v. Quest Software Inc., — F. Supp. 2d — , 2007 WL 3296784, at *12 (C.D. Cal. Oct. 22, 2007) (quoting Tellabs, 127 S.Ct. at 2509).  Nonetheless, the

Court must discount certain scienter allegations in the FCAC because, in some contexts, the Court finds the sources of those allegations to be unreliable.  Because CW6 did not begin work at Dura until after the NDA was filed, the Court finds unpersuasive any allegations concerning events which plaintiffs learned about through CW6 exclusively and which transpired before CW6 became a Dura employee—e.g., the contents of internal reports, the defendants receiving those reports, or extreme-condition tests that senior executives ordered.  (See FCAC ¶¶ 16-18.)  Therefore, the Court discounts the allegation that Ligotke and Gieschen's modification reports were provided to Prettyman and the Regulatory Affairs Department.  (FCAC ¶¶ 95, 122.)  The allegations concerning the product reports similarly fall by the wayside because CW6 is the source of those allegations and the FCAC inadequately distinguishes the product reports from the modification reports.  (Id. ¶¶ 16-17.)

Because CW3 is not a reliable source for the fact or substance of meetings among senior management and with FDA officials, the Court discounts those allegations in its scienter analysis. Plaintiffs allege that the product development problems discussed in those meetings eventually resulted in the rejection of the inhaler's NDA.  Those allegations would provide evidence of scienter, especially with respect to those discussions held shortly before the NDA filing, when defendants allegedly knew that the problems were so severe as virtually to guarantee the NDA's rejection.  However, the Court does not consider these inadequately pled allegations.

After discounting the allegations based on unreliable sources, the remaining allegations relevant to scienter include the following.  Judge Lorenz previously found that plaintiffs adequately alleged the existence of the Eisele List and its distribution to senior management (including the individual defendants).  (Doc. No. 135, at 20:11-14.)  The FDA eventually rejected the inhaler NDA application because of, inter alia, problems of inhaler reliability and Albuterol stability that were first identified in the Eisele List.  (FCAC ¶ 195.)  Between these two events, defendants Garner and Prettyman met weekly with the product development team (which included CW3) to review the results from clinical trials and stability tests.  (Id. ¶ 121.)  In one particular meeting in May 1997, Garner specifically asked about the inhaler's reliability and learned that more than 30% of the inhalers failed during clinical trials.  (Id. ¶ 124.)

1     Pursuant to the Supreme Court's recent directive, the Court now considers the potential

2 inferences which could be drawn from these scienter allegations—both those that favor plaintiffs,

3 and the "plausible nonculpable explanations" of defendants' conduct, based on these allegations of

4 scienter.  Tellabs, 127 S.Ct. at 2510; Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,

5 497 F.3d 546, 551 (5th Cir. 2007); Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 149 (D. Conn.

6 2007).  On the one hand, the Court could infer that the Eisele List put defendants on notice of

7 potential problems with the inhaler.  Defendants kept track of those problems by discussing them

8 with engineers during meetings with the product development team.  In the end, recognizing that

9 the inhaler would never perform perfectly and the NDA filing would never be totally without risk,

10 the defendants concluded that the likelihood of approval was high enough to go ahead with the

11 NDA.  In the dynamic industry of pharmaceutical development, defendants did not have to update

12 investors on all the problems that cropped up along the way, nor should Dura be treated as the

13 insurer of the inhaler NDA.

14     The inference that favors plaintiffs, however, again begins with the proposition that the

15 Eisele List first put defendants on notice of potential problems with the inhaler.  Taken on its own,

16 the Eisele List would not be enough, as defendants received it more than a year prior to the filing

17 of the NDA.  (FCAC ¶ 9.)  Nonetheless, through the weekly meetings with the product

18 development team, Garner and Prettyman learned that Dura was making essentially no progress in

19 remedying the problems initially identified in the Eisele list.  Indeed, Garner specifically inquired

20 about the inhaler's reliability, one of the biggest obstacles to NDA approval.  Through these

21 meetings, Garner and Prettyman learned that, inter alia, the early return rate for the inhaler was

22 30%, versus the industry standard of less than 1%.  Although certain Dura management officials

23 knew facts that essentially guaranteed the failure of the NDA, Dura continued to represent, both in

24 press releases and to analysts, that it was "on track" to bring the product to the market in late 1998

25 or early 1999.  A product would not reach the market, however, unless it first obtained FDA

26 approval.  Therefore, in summary, the inference favorable to plaintiffs is that Dura represented a

27 specific event—the inhaler reaching the market—at the same time that it knew the necessary

28 prerequisite for that event—FDA approval of the NDA application—would not happen.

1    The Court finds this inference of scienter to be "cogent and compelling".  See Tellabs, 127

2    S.Ct. at 2510.  This inference is supported by the length of time that defendants knew about the

3    problems in the inhaler's development, the apparent inability of Dura's product development team

4    to obtain any meaningful improvement in the inhaler performance, the gravity of the problems

5    with the inhaler (including an early return rate more than thirty times the industry standard), the

6    frequency of the product development meetings, Garner's specific inquiry about the inhaler's

7    reliability during one such meeting, and the NDA's failure for the very reasons identified in the

8    Eisele List and discussed during the product development meetings.  All these factors make the

9    inference in favor of plaintiffs "at least as compelling" as the opposing nonculpable explanation of

10   defendants' conduct.  Id.

11       The Court's finding of adequately pled scienter does not implicate all the individual

12   defendants, however.  For example, Newman did not attend the weekly meetings with the product

13   development team—an important part of the scienter inference. Therefore, even though Newman

14   made materially false statements to analysts, those statements are not actionable because the

15   FCAC does not adequately allege Newman's scienter.

16       Even more obviously, the Court must dismiss Spath from the Albuterol Spiros inhaler

17   claim.  Spath did not make any of the statements in the press releases or to analysts.  To the extent

18   that plaintiffs continue to impute liability based on stock sales, the Court rejects those allegations

19   for the reasons stated in Judge Lorenz's Order on the TAC, which, in turn, cited the Ninth

20   Circuit's agreement with that reasoning.  (Doc. No. 135, at 30:18-24.)  Plaintiffs' allegations of

21   scheme liability fail on the basis of Supreme Court precedent issued since the parties completed

22   their briefing and oral argument on this motion.  In Stoneridge Investment Partners, LLC v.

23   Scientific-Atlanta, Inc., the Court held, "[t]he conduct of a secondary actor must satisfy each of the

24   elements or preconditions for liability." — U.S. — , 128 S.Ct. 761, 769 (2008).  Here, plaintiffs

25   have alleged neither that Spath made any materially false statements, nor adequately pled scienter

26   for any statements that Spath might have made.  His attendance at senior management meetings

27   does not establish scienter because of the Court's finding that CW3 is not a reliable source for the

28   allegation of what management officials discussed in those meetings or even that these meetings

took place.

Finally, with respect to Prettyman, the Court has found that CW10 is a reliable source of Prettyman's "involvement" in creating press releases and Dura's rule that all press releases pass through the Regulatory Affairs Department.  (See FCAC ¶ 22.)  The reliability of these allegations, however, does not make them sufficient to satisfy the PSLRA's heightened requirements for pleading scienter.  The allegation of Prettyman's "involvement" does not adequately explain the details of that involvement in the creation of press releases, much less his involvement in creating the press releases at issue in this litigation.  The key case on which plaintiffs rely, McConville v. United States Securities & Exchange Commission, is distinguishable.  465 F.3d 780 (7th Cir. 2006).  There, the Seventh Circuit denied a petition to review an SEC cease-and-desist order by McConville, a former Chief Financial Officer and corporate controller who violated federal securities laws by causing her employer to file inaccurate financial statements with the SEC.  Id. at 786.  In finding substantial evidence that McConville caused her employer to make material misstatements to investors, the Seventh Circuit cited McConville's drafting and review of financial statements that exaggerated the company's profits, authorship of a letter to the company's accountant representing that the financial statements needed no adjustment for impairment of assets, and reviewed and approved a draft 10-K with the inaccurate financials.  Id. at 787-88. Compared to the facts of this case, the FCAC's allegations are not sufficiently specific.  Plaintiffs conclusorily allege that all the individual defendants were responsible for signing off on Dura's press releases and, in fact, participated in the drafting of those press releases.  (FCAC ¶¶ 64, 174.) The Court finds that nonspecific allegations of Prettyman's "involvement" and "participat[ion] in drafting" do not satisfy the PSLRA's heightened requirement for pleading falsity or scienter.  To state a viable § 10(b) claim against Prettyman, plaintiffs must provide more details about Prettyman's involvement and participation in drafting press releases, including the specific releases at issue in this litigation.

With respect to the materially false statements, the Court finds that plaintiff has adequately pled scienter with respect to Dura and Garner.  The Court now considers whether those statements qualify for the PSLRA's safe harbor provision.

4.      Applicability of Safe Harbor Provision

The PSLRA's "safe harbor" provision protects from liability a person that

makes a "forward-looking statement" where

(A) the forward-looking statement is—
        (i) identified as a forward-looking statement, and is accompanied by
meaningful cautionary statements identifying important factors that could cause
actual results to differ materially from those in the forward-looking statement; or . .
.
(B) the plaintiff fails to prove that the forward-looking statement—
        (i) if made by a natural person, was made with actual knowledge by that
person that the statement was false or misleading; or
        (ii) if made by a business entity; was—
                (I) made by or with the approval of an executive officer of that
entity; and
                (II) made or approved by such officer with actual knowledge by that
                officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1); Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v.

Clorox Co., 353 F.3d 1125, 1132 (9th Cir. 2004).  The definition of "forward-looking statement"

includes "a statement of the plans and objectives of management for future operations, including

plans or objectives relating to the products or services of the issuer[.]" 15 U.S.C. § 78u-5(i)(B).  A

pre-PSLRA corollary of the "safe harbor" provision is the "bespeaks caution" doctrine, which

"provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-

looking representations contained enough cautionary language or risk disclosure to protect the

defendant against claims of securities fraud."  In re Worlds of Wonder Sec. Litig., 35 F.3d 1407,

1413 (9th Cir. 1994).

Defendants believe that these doctrines apply to the statements in this case.  The statements

are "forward-looking" in the sense that they talk about a future NDA with the hope of future FDA

approval.[11]  Defendants included cautionary language in their financial reports throughout the class

period (10-K annual reports, 10-Q quarterly filings, etc.). (See Defs. Request for Judicial Notice,

---

[11] As defendants' materially false statements clearly addressed Dura's "future operations," i.e.,
its intent to bring the inhaler to market, the Court rejects plaintiffs' argument that the statements
related to Dura's current operations.  The only statements pertinent to Dura's current operations were
reports that Dura completed clinical trials and filed an NDA: these statements were true when made,
as the Court found supra.

99cv151

Exhibit B.[12])  That language expressly disclaimed any assurance that the FDA would approve

Dura's products.  Furthermore, the language openly conceded that Dura had modified the inhaler

system to deal with problems "encountered with the mechanical features . . . during the pivotal

trials" and explained that the FDA might require Dura to repeat the clinical trials because of these

modifications.  (Request for Judicial Notice ("RJN"), Exhibit N,[13] at 25.)  The press releases

themselves also contain cautionary language, but of a less specific nature.  For example, the

November 10, 1997 press release announcing that Dura filed the NDA contains this disclaimer:

> Except for the historical and factual information contained herein, the matters
> discussed in this press release may contain forward-looking statements which
> involve risks and uncertainties, including the timely development of the Spiros™
> system, government regulation and dependency upon FDA approval, . . . and other
> risks detailed from time to time in the Company's filings with the Securities and
> Exchange Commission.

(RJN, Exhibit Y, at 2.)

The Ninth Circuit has indicated that, even when a forward-looking statement is

accompanied by the requisite cautionary language, the speaker may still be liable if the statement

is made with actual knowledge, and, where "a strong inference of actual knowledge has been

raised," the safe harbor provision would not apply.  No. 84 Employer-Teamster Joint Council

Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 936, 937 n.15 (9th Cir. 2003).

However, the statement in America West was pure dicta, as the court concluded that the

corporation's statements did not qualify as "forward-looking statements."  Id. at 937.  Some

district courts have contested this statutory interpretation and refused to follow America West.

Noting that the safe harbor provision is phrased disjunctively, these courts instead hold that the

existence of cautionary language precludes an inquiry into the defendant's state of mind.  In re

SeeBeyond Techs. Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1164 (C.D. Cal. 2003) (citing

legislative history, the Eleventh Circuit, other district courts, and the Ohio State Law Journal);

accord In re Portal Software, Inc. Sec. Litig., No. C-03-5138 VRW, 2006 WL 2385250 (N.D. Cal.

---

[12] The Court does not take judicial notice of the exhibit itself, but instead of the underlying SEC filings in which these cautionary statements originally appeared.

[13] This document is a Form S-1 registration statement that Dura filed with the SEC on October 10, 1997.

Aug. 17, 2006).  Other courts have followed America West and held that the speaker of a forward-looking statement may be liable if the statement is made with actual knowledge of its falsity, regardless of any accompanying cautionary statements.  Glenbrook Capital Ltd. P'ship v. Kuo, — F. Supp. 2d — , 2007 WL 2601260 (N.D. Cal. Sept. 6, 2007).

The parties have not cited, nor has the Court found, any subsequent Ninth Circuit authority contradicting the statutory interpretation in America West.  Therefore, the Court follows the reasoning of America West.  Because plaintiffs have adequately alleged that defendants Dura and Garner actually knew their statements were false when made, the Court declines to grant the motion to dismiss on the basis of the safe harbor provision.

The Court's decision is also supportable on alternative grounds.  Here, the materially false statements appeared in press releases and oral statements[14] to analysts.  The meaningful cautionary language, including the warning that the FDA might require additional clinical trials because of Dura's modifications to the inhaler, appeared in SEC filings.  The press releases make generic warnings about risks and refer the reader to the Dura's DEC filings.  Where a press release "refers to other factors presented in 'SEC filings' that may threaten [a product's] ultimate success", the safe harbor provision does not apply because the corporation "does not specify what these risk factors are, instead leaving investors to obtain these other documents and compare their contents" with the press release.[15]  Immune Response, 375 F. Supp. 2d at 1035.  Applied to these facts, the Court considers only the language in the press releases themselves, not the SEC filings mentioned in those press releases.  The press releases refer vaguely to the contingency of FDA approval, but do not disclose the specific clinical trials. Instead, the press releases leave plaintiff investors in the position of having to obtain the SEC filings and compare them with the press releases.  The Court

---

[14] Defendants offer no argument relative to the applicability of the specific safe-harbor exception for forward-looking oral statements.  See 15 U.S.C. § 78u-5(c)(2).

[15] At the motion-to-dismiss phase, the Court declines to find that the allegedly concealed information was already disclosed to the market "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996) (internal quotation omitted). The Court further finds that defendants' representations of being "on track" to bring the inhaler to market (even though defendants allegedly knew that the inhaler would not be able to obtain the prerequisite FDA approval) are sufficiently specific to avoid dismissal as non-actionable puffery.

1    declines to apply the safe harbor provision.

2          5.    <u>Secondary Liability</u>

3          The Court finds that, with respect to the Albuterol Spiros inhaler allegations, the FCAC

4    sufficiently states a claim against Newman, Garner, and Spath for controlling person liability

5    under § 20(a) of the Securities Exchange Act of 1934.  In so finding, the Court adopts the

6    reasoning of Judge Lorenz's Order previously allowing plaintiffs' § 20(a) claim to go forward

7    against Newman, Garner, and Spath with respect to the TAC's Ceclor CD allegations.  (Doc. No.

8    135, at 36:13-20.)

9    **C.    Ceclor CD**

10         1.    <u>Prettyman's Liability</u>

11         The only question relative to the Ceclor CD claim in the present motion is whether

12   plaintiffs have adequately alleged Prettyman's liability for the scheme to overload wholesalers

13   with Ceclor CD to inflate Dura's earnings.  For the reasons stated <u>supra</u>, the Court dismisses the

14   claim with respect to Prettyman.[16]  The Court follows Judge Lorenz's reasoning concerning the

15   inadequacy of plaintiffs' attempt to impute liability via stock sales, and plaintiffs' "scheme

16   liability" allegations fall short in light of the Supreme Court's opinion in <u>Stoneridge Investment</u>

17   <u>Partners</u>.  Furthermore, plaintiffs' attempt to state a § 10(b) cause of action for primary liability

18   fails because plaintiffs have pled with insufficient specificity Prettyman's "involvement" and

19   "participation" in drafting the relevant press releases issued by the Regulatory Affairs Department

20   during the class period.

21   **D.    Leave to Amend**

22         "'Dismissal without leave to amend is improper unless it is clear, upon de novo review,

23   that the complaint could not be saved by any amendment.'" <u>Intri-Plex Techs., Inc. v. Crest Group,</u>

24   <u>Inc.</u>, 499 F.3d 1048, 1056 (9th Cir. 2007) (quoting <u>Daou</u>, 411 F.3d at 1013).  Here, it is not clear

25   that the remaining deficiencies in the FCAC cannot be saved by an amendment.  Therefore, the

26   Court gives plaintiffs a final opportunity to amend.

27   ────────────────────

28       [16] The analysis for Prettyman's liability with respect to the Albuterol Spiros allegations is
virtually indistinguishable from the liability analysis on the Ceclor CD claim.

**CONCLUSION**

Concerning the allegations regarding the Albuterol Spiros inhaler, the Court **ORDERS** as follows:

—The Court **denies** the motion to dismiss the first cause of action with respect to defendants Dura and Garner.  The Court **grants** the motion to dismiss the first cause of action with respect to Newman, Spath, and Prettyman.

—The Court **denies** the motion to dismiss the second cause of action with respect to all defendants named in that cause of action—Newman, Garner, and Spath.

Concerning the allegations regarding the Ceclor CD claim, the Court **GRANTS** the motion to dismiss the first cause of action with respect to defendant Prettyman.

Within thirty days of the date that this Order is electronically docketed, plaintiffs **MAY FILE** an amended complaint that addresses the deficiencies in pleading discussed above.

If plaintiffs do not file an amended complaint in the time so provided, the FCAC shall proceed against defendants with respect to the Ceclor CD allegations as outlined in Judge Lorenz's Order on the TAC.  With respect to the Albuterol Spiros inhaler allegations, the FCAC's first cause of action shall proceed against defendants Dura and Garner to the extent consistent with the reasoning of this Order, and the second cause of action shall proceed against defendants Garner, Newman, and Spath.

Should plaintiffs not file an amended complaint, defendants **SHALL FILE** an Answer to the FCAC within 45 days of the date that this Order is stamped "Filed."

IT IS SO ORDERED.


DATED:  February 20, 2008


_Janis L. Sammartino_
Honorable Janis L. Sammartino
United States District Judge

99cv151